

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-20-00120-CV

_____


IN THE INTEREST OF H.L., A CHILD

---

On Appeal from the 325th District Court
Tarrant County, Texas
Trial Court No. 325-576094-15

---

Before Sudderth, C.J.; Gabriel and Wallach, JJ.
Memorandum Opinion by Justice Wallach

# MEMORANDUM OPINION

In the underlying private termination case concerning eight-year-old Hillary,[1] a jury found that (1) Mother and Father engaged in conduct or knowingly placed their daughter, Hillary, with persons who engaged in conduct that endangered Hillary's emotional or physical well-being; (2) Father knowingly placed or knowingly allowed Hillary to remain in conditions that endangered her emotional or physical well-being; (3) Mother voluntarily left Hillary alone or in the possession of another without providing adequate support for her and remained away for at least six months; (4) Mother failed to support Hillary in accordance with her ability during a period of one year ending within six months of October 2018; and (5) the termination of Father's and Mother's parental rights was in Hillary's best interest. The trial court's termination order echoed the jury's findings.[2] Father did not appeal, but Mother and her thirteen-year-old son were again living with Father at the time of trial, making the evidence against him relevant in this appeal. In her sole issue, Mother contends only that the evidence is legally and factually insufficient to support the best-interest finding against

---

[1]We use aliases to refer to the children and their families. *See* Tex. R. App. P. 9.8(b)(2) (requiring courts to use aliases to refer to minors in parental-rights termination cases and, if necessary to protect the minors' identities, to also use aliases to refer to their family members); *see also* Tex. Fam. Code Ann. § 109.002(d).

[2]The trial court denied Mother's motion for judgment notwithstanding the verdict and alternative motion for new trial.

her. Because we hold that the evidence is legally and factually sufficient to support that finding, we affirm the trial court's judgment.

## I. BACKGROUND AND PROCEDURAL FACTS

### A. Mother's Children

Mother had three children: Billy, Barry, and Hillary. Billy, the eldest, was thirteen years old at trial. He had "been in and out of" Mother's care "at least five times" but had been living with her for more than a year at the time of trial. Barry was eleven years old at trial, but Mother had voluntarily relinquished her parental rights to Barry when he was a year old. Mother explained to the jury that Billy's father died of a drug overdose in 2009, that Billy "[went] through a lot . . . dealing with that," and that she "was going through a lot dealing with that." Mother also testified that Barry's father had abused her and that she was concerned that she would be forever tied to him if she kept Barry. Barry's paternal grandmother adopted him in 2012. Barry's grandmother testified that she had "pretty much" had possession of Barry since Billy's father overdosed when Barry was three months old. She and Mother both testified that Mother never bonded with Barry. A few months before the trial underlying this appeal, Mother asked to see Barry for the first time since his second birthday. Barry's grandmother declined because Barry had a stable life and was "just not emotionally mature enough [yet] to deal with that."

Hillary, the only child before the court in this suit, was born in October 2011 to Mother and Father. Even by Mother's account, before this lawsuit, she had not had any

contact with Hillary in about two and a half years and had not tried to contact her more than five times in that same period. Other evidence indicated the gap in contact was more than three years and that Mother attempted to contact Hillary only once in that period. Because the trial court blocked the parents from seeing Hillary while the suit was pending, the gap in contact widened by more than another year by the time of trial.

## B. Facts Leading to Hillary's 2014 Placement with the Fosters

### 1. Mother's Drug Abuse

Mother, who was thirty-two years old at trial, began using drugs in her late teens, and she continued to abuse drugs for more than a decade. All three of Mother's children were born during the period in which she abused drugs. One of Mother's long-term drugs of choice was Xanax. She abused it off and on for years before Hillary was born. Mother stopped abusing drugs at some point during her pregnancy with Hillary but began abusing Xanax again in 2012, when Hillary was about six months old. Mother was Hillary's primary caretaker at the time.

When Hillary was about eight months old, Mother was arrested for the possession of Xanax, which she testified she obtained from people on the street. She pled guilty to the possession of Xanax and received six months' deferred adjudication community supervision. Mother completed her deferred adjudication community supervision successfully but began abusing prescription drugs again soon after. By August 2014, she was abusing both Xanax and hydrocodone.

4

## 2. Father's Drug-Related Crimes

Father, who was thirty-three years old at trial, testified that while he had used marijuana on occasion, he did not have a drug problem. Father's problem was staying out of criminal trouble. Father was first arrested when he was fifteen years old and had convictions in 2004 and 2006. The evidence at trial did not explore the details of Father's prior convictions, but he admitted that by 2014, when he, Mother, Billy, and Hillary were living together in a house in North Richland Hills, it was against the law for him to possess a gun. A gun, registered to Mother, was kept in the house in a locked safe.

In 2014, Mother went to school full-time, and Father sold drugs, mainly prescription drugs—including Xanax and hydrocodone—for a living. He had no other form of employment. Father stored the drugs in a locked safe in the house. He testified that Mother did not know the combination to the drug safe and that her gun was in a separate, locked safe. Father testified that he did not sell drugs out of the house but instead went to the buyers' homes or conducted the transactions in a public place. He also testified that he never had the drugs in a car that the children "may have ridden in." Finally, he denied providing Xanax to Mother and denied seeing her use Xanax. For her part, Mother denied at trial that she had known about Father's keeping drugs in their home before the police found them.

### 3. Involvement of Police and Child Protective Services (CPS)

At 8:00 p.m. one August 2014 evening, the police arrived at the home with a search warrant. Father and Hillary were not at home, but Billy was. The police found the gun and a large quantity of drugs, including more than twenty pounds of marijuana, more than 28 grams but less than 200 grams of Xanax, more than 28 grams but less than 200 grams of hydrocodone, and 1 or more but less than 4 grams of a drug similar to Ecstasy. The police arrested Father, and he bonded out the next day. CPS got involved because of the discovered drugs and Mother's drug abuse. Mother was using Xanax and hydrocodone.

CPS told the parents to place the children with a family member to avoid their being removed and placed in foster care. At first, the children stayed with Father's sister, but she asked him to find another placement.

### C. Placement with the Fosters

Father contacted Mrs. Foster, his maternal first cousin, about taking the children temporarily. Mrs. Foster had been his nanny in his infancy.[3] Mrs. Foster had seen the children once over a year earlier. Her husband had never seen the children. After meeting with CPS, the Fosters agreed to take the children in. Hillary's third birthday occurred in the month after her placement.

---

[3]Father's mother and Mrs. Foster's mother are sisters.

The placement was supposed to be temporary, perhaps as short as six to eight weeks, to allow Mother to get her "stuff together." CPS directed Mother to complete several tasks, including parenting classes, substance abuse treatment, counseling, passing drug tests, attending Narcotics Anonymous (NA), and obtaining stable employment. Mother "had anticipated getting a job, getting an apartment, getting her life together, not using drugs, and getting the kids back," which the Fosters were "on board with." The Fosters agreed to give the children back to Mother after she was "cleaned up" but did not say that that agreement would never change.

Until Father went to jail for his crimes in November 2014,[4] the parents visited the children weekly, and both parents told Mrs. Foster that they were taking parenting classes. However, she saw little progress. Mother often slurred her words on visits, and she failed drug tests before and after Thanksgiving 2014. After Father's confinement, Mother at first continued her weekly visits, but her visits tapered off to monthly by May 2015, when the school year ended and Billy moved to live out of state with his maternal uncle. In that same month, the Fosters filed suit for managing conservatorship of Hillary.

Mr. Foster testified that Mother last saw Hillary "[n]ot very long after [Father] went to prison." Mother testified that she last saw Hillary in March 2016, but Mrs.

---

[4]In exchange for a prison sentence of eight years, Father ultimately pled guilty to possession of marijuana, to possession of the various types of pills with intent to deliver, and to the unlawful possession of a firearm by a felon.

Foster testified that Mother last saw Hillary in the summer of 2015. Mother still slurred her words during that last visit. The Fosters obtained managing conservatorship of Hillary in July 2015; Mother did not participate in the suit. Mrs. Foster testified that Hillary stopped talking about Mother and Father by 2016.

### D. Mother's Progress

Mother never completed the CPS services to regain possession of her children. She attended a 28-day rehabilitation program in 2015, but she relapsed in 2016. However, after a "rather traumatic event" in 2016, she checked herself into a faith-based Christian rehabilitation center; the minimum stay was six months. While living there, she was prohibited from getting a job, from having her own money, and from possessing a cell phone. Although Mother admitted that she could have left the center after six months if she had successfully completed the program, she testified that she chose to stay for over two years—until September 2018—to ensure her sobriety. At trial, she testified that she remained at the center for more than two years because she "wanted to make sure whenever [she] was ready to leave in September of 2018 that [she] was not going to fall back into [her] old lifestyle" and wanted to show that she was "here for [Hillary] a hundred percent."

In the summer of 2017, Mother and Mrs. Foster had a random encounter while Mother was grocery shopping for the center. Mother invited Mrs. Foster to bring Hillary to a church service at the center. Mrs. Foster did not take Hillary because she did not think that was the appropriate way to reacquaint the little girl with Mother,

whom she had neither seen nor heard from in two years, and because Mother indicated that she could only spend a brief amount of time with Hillary after the church service.

Mother testified that during her extended stay at the center, she was allowed one phone call per week. That means Mother could have made over 100 calls during her stay. Mother claimed that she left voicemails for Mrs. Foster three or four times during her stay of more than two years at the center, but Mrs. Foster denied receiving those voicemails. Mrs. Foster also testified that Mother never asked for access again after the July 2017 random encounter until this lawsuit was filed.

### E. Family Litigation

In February 2018, Father's parents (Grandparents) filed a petition for grandparent possession of or access to Hillary.[5] Mother testified for Grandparents in March 2018 but did not seek access to Hillary at that time. The Fosters put Hillary in counseling with Gina Galloway in July 2018. On September 11, 2018, Father was released from prison. Father asked to see Hillary within days of his release. Mrs. Foster denied the visit because Hillary did not remember Father, and Mrs. Foster "figured [she] needed to talk to Gina Galloway and reintroduce them [(Hillary and Father)] somehow, if that was to happen." The Fosters filed their petition for termination and adoption on October 19, 2018, Father filed his motion to modify at the end of that

---

[5]An appeal from those proceedings is pending. *See In re H.L.*, No. 02-20-00143-CV (Tex. App.—Fort Worth filed May 8, 2020).

month, and Mother filed a counterpetition to modify less than a week later. It is unclear from the record whether Mother sought contact with Hillary in the short period between leaving the center in late September 2018 and filing her counterpetition. Within a week of Mother's filing her counterpetition, the trial court issued an order prohibiting contact between the parents and Hillary pending the termination trial.

With her brother and sister-in-law's agreement, Mother retrieved Billy from her brother's out-of-state home near the end of 2018.

### F. Mother and Father's Reunion

Mother and Father communicated off and on while he was in prison but corresponded by letter only "a couple of times" while she was in the center. After he was released from prison and she left the center, she dated another man for a while but began dating Father again in March 2019, and they moved into a four-bedroom house together with Billy on April 1, 2019.

## II. DISCUSSION

### A. Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802. Mother does not challenge the sufficiency of the evidence supporting the Section 161.001(b)(1) grounds found by the trial court. We therefore confine our analysis to the evidence supporting the best-interest finding.

To determine whether the evidence is legally sufficient to support the best-interest finding, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could form a firm belief or conviction that termination of Mother's parental relationship with Hillary is in Hillary's best interest. *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child

relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's best-interest finding and do not supplant it with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Fosters proved that the termination of the parent–child relationship would be in Hillary's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## B. Law on Best Interests

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

(A)   the [child's] desires . . . ;

12

(B)    the [child's] emotional and physical needs[,] ... now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the [child's] best interest ... ;

(F)    the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the [parent's] acts or omissions ... indicat[ing] that the existing parent–child relationship is not a proper one; and

(I)    any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## C. Scope of Review

Mother attempts to limit our review to only two *Holley* factors—Hillary's desires and her current and future emotional and physical needs—on the premise that Mother just wants "limited visitation rights," not custody. We reject Mother's premise. *First*, by filing a general denial to the Fosters' petition to terminate and by challenging the trial court's termination order in this appeal, Mother sought and seeks to retain all the rights of a parent. *Second*, in her counterpetition, she sought not "limited visitation," but "access to and possession of [Hillary] in any manner deemed appropriate by the Court." *Third*, at trial, the testimony explored the possibility of Hillary's having both her home with the Fosters and a home with Mother and Father. Thus, Mother did not and does not seek merely "limited visitation." We also reject Mother's attempt to limit our review. Even when access to a child is the only issue in a suit affecting the parent-child relationship, the child's best interest remains the court's primary consideration. Tex. Fam. Code Ann. § 153.002. That determination "does not require proof of any unique set of factors, nor does it limit proof to any specific factors." *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.); *see also In re M.L.*, No. 02-15-00258-CV, 2016 WL 3655190, at *3 (Tex. App.—Fort Worth July 7, 2016, no pet.) (mem. op.).

## D. Application of the Relevant Best-Interest Factors

### 1. Hillary's Desires

At trial, eight-year-old Hillary knew (because her brother told her) that Mother and Father were her parents, but she had no memory of them. Hillary's counselor, Gina

Galloway, testified as follows about Hillary's desires and bonds with the Fosters and Mother and Father:

- Hillary wanted to be adopted and have the same last name as the Fosters.

- Hillary saw the Fosters as her parents.

- Hillary referred to the Fosters as her parents.

- Hillary had the feelings for the Fosters that would be typical of the feelings a child her age has for her parents: "She enjoys time with them . . . . She's still at the age where kids really enjoy their parents, and so she sees them very positively."

- When Hillary began counseling on July 23, 2018, she did not know about Mother and Father or who they were.

- Billy told Hillary who her biological parents were while they were both visiting Grandparents before the issue could be explored through counseling.

- Hillary did not want to deal with the issue, and it was somewhat difficult for her to process.

- Hillary was "sad and nervous" about the prospect of knowing Mother and Father.

- Hillary was sad to discover that the Fosters were not her biological parents, and it had been "a lot for her to take in."

- Hillary was nervous about the prospect of seeing Mother and Father.

- Hillary was less nervous when Galloway spoke to her about seeing Mother and Father not long before the trial. However, Hillary said that she would not want to see them at her house.

- Hillary said that she did not remember a time with Mother and Father as her parents.

- Hillary understood that Mother and Father were her biological parents but did not see them as her parents.

- Hillary had not expressed any curiosity about Mother and Father; Galloway believed that was Hillary's way of coping.

- It would be "emotionally difficult" for Hillary if the termination were not granted and the Fosters could not adopt her, but Galloway "[didn't] know if [she] would say [it would be] emotionally harmful."

Mother testified that it would make a difference to her if Hillary wanted to be adopted.

Mother argues that this factor is neutral because Hillary did not testify, relying on *In re C.V.L.*, 591 S.W.3d 734, 754 (Tex. App.—Dallas 2019, pet. denied). We are not bound by our sister court's pronouncement. *Johnson v. Simmons*, 597 S.W.3d 538, 545 (Tex. App.—Fort Worth 2020, no pet.). *First*, Hillary was not too young to express her desires; her counselor testified about them. *Second*, this court has repeatedly held that "[w]hen children are so young that they cannot express their desires, the factfinder can consider their bonds with their parents and their current caregivers and the quality of care the children receive." *In re L.F.*, No. 02-19-00421-CV, 2020 WL 2201905, at *8 (Tex. App.—Fort Worth May 7, 2020, no pet.) (mem. op.); *see also In re V.B.*, No. 02-17-00318-CV, 2018 WL 771976, at *7 (Tex. App.—Fort Worth, Feb. 8, 2018, no pet.) (mem. op.). Given the evidence about Hillary's desire to be adopted, the strong bonds she had with the Fosters, and the absence of any bond between Hillary and Mother, the jury was entitled to find that this factor weighed in favor of termination. *See In re G.S.*, No. 02-19-00390-CV, 2020 WL 1294925, at *6, *8 (Tex. App.—Fort Worth Mar. 19, 2020, pet. denied) (mem. op.).

16

## 2. Hillary's Present and Future Needs

Mother did not know what eight-year-old Hillary's needs were. Mother testified:

- She left the treatment center after two years with no knowledge of Hillary's life at that point.

- Mother was unable to know anything of Hillary's life.

- Mother did all she could to stay in contact with Hillary during the four years between Hillary's placement with the Fosters and Mother's leaving the treatment center.

- Mother never contacted Hillary's school or pediatrician.

- Mother could have left the facility for a visit with Hillary if Mrs. Foster agreed.

- Mother was willing to do whatever it took to reunify with Hillary, including going to counseling and taking drug tests.

- Mother was willing to let Hillary continue to live with the Fosters.

- Hillary could adjust to seeing Mother and Father.

- Mother did not know what Hillary's wants and needs at the time of trial were.

On the other hand, evidence showed that the Fosters had satisfied Hillary's needs for more than five years and wanted to continue to do so. Hillary was described by those who knew her as loving, healthy, happy, bright, good at sports and academics, high-achieving, crazy about her pets, and well adjusted. She treated the Fosters as her parents; they treated her as their daughter. The Fosters supported Hillary's passion for volleyball while at the same time setting high expectations regarding her academics and behavior. Hillary had pets, chores, and a routine and loved unicorns. She looked

17

forward to joining 4-H and being able to show an animal in the stock shows the next school year. She also had an extended support system, which included the Fosters' three daughters (who viewed her as a sister and vice versa), friends, her volleyball coach, and Ms. Galloway.

The Fosters realized that termination of the parents' rights to Hillary would not foreclose further contact with them. They believed that Hillary's relationship with Billy was important and intended to facilitate it even if Mother's rights were terminated. The Fosters therefore recognized that regardless of the suit's outcome, they would still need to communicate with Mother to maintain the siblings' relationship. Further, even if Mother's rights were terminated, Mrs. Foster did not intend to keep Hillary away from Mother until Hillary became an adult. Mrs. Foster testified that contact could occur after counseling and discussing matters with Hillary and when Hillary was "at that point and mature and decide[d that] she want[ed] to know more about her family." At the time of trial, Ms. Galloway had not indicated that Hillary's meeting her biological parents was appropriate yet. When asked in cross-examination whether she was saying that Mother and Father could see Hillary after termination at her discretion or when Hillary was ready, Mrs. Foster replied,

> I think that it would be a mix of both, because I would still have to be the one in discretion of it, but . . . it would be up to [Hillary]. I'm not going to deny her parentage from her. I know she knows I'm not her natural mother, and I'm never going to deny what she wants to explore with her parentage.

When asked whether her answer showed her recognition that Mother and Father were no longer a danger to Hillary, Mrs. Foster replied, "I didn't say how the visits were going to happen. We were going to go through counseling, . . . I didn't say if they were going to be supervised. I didn't say anything. I don't know yet how that looks, because we are not there." When asked whether her considering access demonstrated her recognition that Mother and Father had changed since placing Hillary with the Fosters in 2014, Mrs. Foster answered, "I can't answer that, because I don't know when that access would happen. I don't know if it's [8] years old or 18 years old, 16, 15, 14, I don't know when [Hillary] is going to be mature for that, so I can't answer that." Mrs. Foster conceded that every decision she had made concerning Hillary might not have been perfect but stated that she had considered Hillary's best interest before making each decision and that "from here on out," all Mrs. Foster cared about was what was in Hillary's best interest.

Mother was more focused on her needs than Hillary's. Mother did not want to voluntarily terminate her rights to Hillary because

- They had a relationship in the past.

- Mother believed that she would be a positive influence on Hillary.

- Mother did not see how she "would negatively affect" Hillary after making changes in her life.

- Hillary was Mother's daughter.

- Mother loved Hillary.

19

- A relationship would benefit both of them.

Ms. Galloway testified that living in two households would be stressful for Hillary and could cause anxiety; it would be a major change that would require her to adjust. Mother believed that Hillary could adjust to seeing her and Father again.

The Fosters did not think Hillary should have to adjust. Mr. Foster testified,

> [S]ince 2014 she's . . . been in my house, and I have taken care of her just like one of my daughters, and—and she's my daughter. . . . I can't put it any other way. I'm sorry if that hurts somebody's feelings or whatever, but she didn't ask for it, I didn't ask for it, it is what it is. . . .
>
>  . . . . This is what she knows. This is all she knows. She was two years old when she came to my house, and now she's eight. This is the life she knows. That's . . . it. That's all I can say is this is what she knows.
>
> Why . . . would anybody want to rip an innocent child away from the only thing she knows?

Mrs. Foster testified that not terminating Mother's and Father's rights and introducing Mother and Father to Hillary at this point would not be in her best interest:

> I think at this point it's [Hillary's] decision when she's ready to have that in her life. And she knows of them, and . . . she just knows of them, and she's not asking at this point to be reintroduced. And it would be a complete life adjustment for her of all the activities that she does and everything that we have going on, and I think it would be a foreign thought to her for her to be reintroduced and then visiting a home that she's not really understanding the whole dynamics of parenting and all of that. It would just be really confusing to her.

Mrs. Foster also testified that if Hillary were with Mother and Father, her routines and activities would be disrupted; Mrs. Foster believed Hillary's life should stay the same. When asked on cross-examination whether Hillary's routines and activities were more

important than her having a relationship with her biological parents, Mrs. Foster testified, "This is her life right now. So what is important to her is important to her," and "It's important to me that everything that happens to her is in her best interest." The jury was entitled to find that this factor weighed in favor of termination.

### 3. Present and Future Danger to Hillary and Stability

Any future danger to Hillary stemmed from the parents' past bad choices and the absence of a long-term record of good choices and stability. The jury found that Father and Mother had endangered Hillary, and those findings are not challenged on appeal. Mother did not remember whether her drug abuse impaired her parenting of Hillary but admitted that it could have. Nevertheless, Mother did not think that Hillary was ever physically or emotionally harmed by the drug abuse, nor did Mother believe that she had ever allowed Hillary to remain in a physically or emotionally damaging place. Mother conceded, however, that Father put Hillary in danger by having drugs in the house. Father admitted that dealing drugs was dangerous but testified that he was not concerned that Hillary was sleeping in the same house as "copious" amounts of drugs and a gun and refused to admit that he had placed her in danger.

Mother testified that she had been sober since July 3, 2016. Father testified that he had not used any illegal drugs since the fall of 2014. He also discussed classes he had completed in prison—including drug recovery and education, behavioral modification, parenting, and vocational classes. He additionally testified,

> Up until [a] year and a half ago[,] I have never, for the most part, had a job, held a job, any of those things that normal everyday law[-]abiding citizens do.
>
> You know, for that matter, I have never stayed out of trouble for this duration of time. As insignificant as that may seem, a year and a half to most it might not seem like much, but, you know, the way I see it I have got to start somewhere.

However, Father admitted that he had "[n]ot exactly" done enough yet to prove that he should have Hillary even part-time.

While no one offered evidence to dispute the parents' sobriety dates, the evidence showed that Mother's drug abuse lasted over a decade, and she had relapsed before. Father admitted that the last year and a half had been the longest period he had ever stayed out of trouble and the longest period he had ever held a job, and he was still on parole at the time of trial.

Mr. Foster testified that not terminating Mother's parental rights would "mess [Hillary] up very bad" because "all she kn[ew]" was her life as one of the four Foster daughters. He believed that not terminating Mother's parental rights would "hurt [Hillary] very bad," that "[s]he would be very confused," and that it would be detrimental to her health. Mrs. Foster did not know whether she had concerns for Hillary's safety with Mother and Father because she did not have enough information about them. Mrs. Foster did not believe that the sixteen months since Father had been released from prison was long enough to show that Hillary's life would not be touched by his criminality again or that he would remain in her life. Mrs. Foster also testified

that in Father's past, and again when he was released from prison in September 2018, he had problems with alcohol, and using alcohol was a violation of his parole. As for Mother, Mrs. Foster testified that at trial, "[j]ust stability" was her concern. Mrs. Foster also believed that Mother's parental rights to Hillary should be terminated because otherwise, Mrs. Foster could not be sure "that CPS would never touch [Hillary's] life again."

However, Mrs. Foster testified that she could guarantee that CPS would not be in Hillary's life if Hillary remained with the Fosters. Further, alcohol was not allowed in the Fosters' home, and no evidence indicated that drugs were used.

It is unclear from the record how long Mother and Father were together before placing Hillary with the Fosters in September 2014, but their contact between November 2014 and September 2018 was at best sporadic, and they dated again less than a month before moving in together in April 2019, less than a year before the trial. On the other hand, the Fosters had been together twenty-eight years and married almost twenty-five years. While they had experienced marital problems resulting in separation and divorce filings, those problems were resolved more than a decade before trial and long before Hillary joined their household.

We agree with Mother that the parents' past drug involvement was insufficient alone to show an absolute present and future danger to Hillary. However, based on the parents' failure to completely recognize the dangerous impact of their past drug-related decisions on Hillary, Mother's decision to again live with Father less than a month after

23

they reconnected, her relatively short period of sobriety as compared to her long period of addiction, his admissions that the eighteen-month period before trial was the longest period he had stayed out of trouble and that he had not yet done enough to have Hillary part-time, and Mother's work hours that would leave Hillary solely in Father's care at night, the jury was entitled to reject the parents' testimony that they could provide stability for Hillary in the face of abundant evidence that Hillary's home with the Fosters—the only home she remembered—was, had been, and would continue to be stable and supportive. The jury was entitled to find that these factors supported termination.

### 4. Best-Interest Conclusion

After doing a lot of things wrong, both parents took significant steps to improve themselves and are to be commended for doing so. However, in the years it took for Mother to stop abusing drugs, to rehabilitate herself, and to reestablish a life outside of the treatment center, her toddler grew into a first-grader who no longer remembered having any relationship with Mother.[6] It was Mother's decisions, both before and after the placement of Hillary with the Fosters, that led to that result. Having reviewed all the evidence according to the appropriate standards of review, *see J.P.B.*, 180 S.W.3d at 573 (providing legal-sufficiency standard of review); *C.H.*, 89 S.W.3d at 18–19, 28 (providing factual-sufficiency standard of review), we hold that the evidence is legally

---

[6]Hillary was in second grade by the time of trial.

and factually sufficient to support the best-interest finding against her. We overrule Mother's sole issue.

## III. CONCLUSION

Having overruled Mother's only issue, we affirm the trial court's judgment.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered: October 8, 2020